**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JEANNE STEINMETZ,<br>        *Plaintiff*, | )<br>)<br>) |
| | ) |
| v. | ) |
| | ) |
| WESTERN CONNECTICUT HOME<br>CARE,<br>        *Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>) |

3:19-CV-1819 (OAW)

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the court upon Defendant's Amended Motion for Summary Judgment and memorandum in support thereof (together, "Motion").  *See* ECF Nos. 63–64.  The court has reviewed the Motion, Defendant's Amended Statement of Material Facts ("Defendant's SOF"), *see* ECF No. 65, Plaintiff's Objection to the Motion and memorandum in support thereof,[1] *see* ECF Nos. 68 and 68-1, Plaintiff's Statement of Material Facts ("Plaintiff's SOF"), *see* ECF No. 69, Defendant's Reply in support of the Motion, *see* ECF No. 70, all supporting exhibits, and the record in this matter and is thoroughly advised in the premises.  For the reasons discussed herein, the Motion is **GRANTED.**

---

[1] Defendant points out that Plaintiff's brief refers to Defendant's first motion for summary judgment, not the amended motion.  Defendant also notes that Plaintiff's brief still lists as a party an entity which since has been substituted.  The court will disregard these apparent typographical errors.

## I.   BACKGROUND[2]

Defendant is an organization that provides in-home healthcare to adults and children. ECF No. 65 at ¶ 1.[3] Plaintiff is an Advanced Practice Registered Nurse who worked for Defendant, mostly in per diem and part-time nursing positions,[4] until 2017.[5] ECF No. 65 at ¶ 4; ECF No. 69 at p.2, response to ¶ 4. Clinical Director Brian O'Loughlin and Executive Director Alyson Blanck hired Plaintiff as a full-time Maternity Child Health/Home Health Aide Supervisor, a position she formally assumed in October 2015. ECF No. 65 at ¶ 13; ECF No. 69 at p. 5, response to ¶ 13. In this role, Plaintiff was responsible for, inter alia: recruiting, training, and managing over a dozen registered nurses and home health aides; managing program budgets; growing the programs; scheduling staff; and providing direct care to patients. ECF No. 65 at ¶¶ 14–15; ECF No. 69 at p. 5–6, responses to ¶¶ 14–15. She was directly supervised by Director O'Loughlin, and her second-level supervisor was Director Blanck. ECF No. 65 at ¶ 13; ECF No. 69 at p. 5, response to ¶ 13.

---

[2] All factual assertions are taken from Defendant's SOF and Plaintiff's SOF. The court notes that Plaintiff's SOF fails to respond to several of Defendant's asserted facts. Where Plaintiff neither has admitted nor denied a fact asserted in Defendant's SOF, and where the asserted fact is independently supported by cited record evidence, the court has deemed the asserted fact admitted. *See* D. Conn. L. Civ. R. 56(a).

[3] Plaintiff begins her objection with a reference to a "non-existent defendant," but this accusation appears to be held over from a previous briefing. *See* ECF No. 36-1 at 2. There is no real dispute that Defendant is properly named.

[4] Defendant devotes considerable ink to describing one particular part-time position from which Plaintiff resigned in 2015 after allegedly having displayed certain performance issues. Defendant's intention appears to be to show that Plaintiff's professional shortcomings had been documented even before she accepted the position at issue in this case. However, the court is not convinced that Plaintiff's previous employment is probative of the issues presented here, and so the court has not considered these facts in the ensuing discussion.

[5] The parties dispute the year Plaintiff started working for Defendant. Defendant states Plaintiff started in 2001, while Plaintiff asserts she began earlier than that. *Cf.* ECF No. 65 at ¶ 4, *with* ECF No. 69 at p. 2, response to ¶ 4. Calculating the starting year is complicated by the fact that a portion of Plaintiff's career was spent working for a different organization that later became a part of Defendant's organization. In any event, the start date is immaterial to this discussion.

Plaintiff and Defendant characterize Plaintiff's time in this role somewhat differently. Defendant asserts that although Plaintiff initially received strong performance reviews in her new position, her supervisors began noticing and documenting deficiencies in spring 2017. Plaintiff denies that she exhibited any deficiencies in her performance and contends that she was sabotaged by a supervisee who wanted Plaintiff's position for herself. The court will recount the alleged deficiencies in chronological order.

### a. March 2017

In March 2017, Director Blanck received a report from Lisa Dugan, one of the registered nurses whom Plaintiff supervised, that Plaintiff was deficient in certain duties and skills, constantly calling RN Dugan with questions to which Plaintiff should have already known the answer. ECF No. 65 at ¶ 20. Plaintiff responds that RN Dugan would not communicate with Plaintiff and then complained to Plaintiff's supervisors that Plaintiff was uninformed. ECF No. 69 at p. 7, response to ¶ 20.

Defendant asserts that RN Dugan further reported that Plaintiff had been affixing RN Dugan's name to certain forms inappropriately. ECF No. 65 at ¶ 20. Director Blanck spoke to Plaintiff about this allegation, and Plaintiff admitted to signing RN Dugan's name on the forms, claiming she did not realize the practice was improper. ECF No. 65 at ¶ 21. Defendant asserts that Director O'Loughlin provided Plaintiff with additional coaching and counseling in response to the concerns RN Dugan raised. *Id.* at ¶ 21. Plaintiff does not respond to these assertions.

### b. April-July 2017

Defendant alleges that in April 2017, Sara Osiecki, a scheduler on Plaintiff's staff, also complained about Plaintiff, alleging that Plaintiff could not operate the scheduling

software and was not managing her home health aides, instead expecting Scheduler Osiecki to counsel home health aides on performance issues.  ECF No. 65 at ¶ 23. Plaintiff asserts, though, that Scheduler Osiecki's accusations against her were baseless; Plaintiff was not expected to be able to operate the scheduling software, and the counseling sessions with home health aides were held to address complaints Scheduler Osiecki herself had lodged against the aides.  ECF No. 69 at p. 9, response to ¶ 23.

Also in April 2017, Defendant states that a survey conducted by the Connecticut Department of Health revealed that Plaintiff was still using an outdated form despite instructions from Director Blanck to destroy all the obsolete forms.  ECF No. 65 at ¶ 22. Defendant alleges that the oversight could have resulted in costly sanctions.  *Id.*  Plaintiff does not respond to these assertions.

Defendant asserts that Director O'Loughlin provided Plaintiff with additional counseling in response to these incidents.  *Id.* at ¶ 24.  He also asserts that he issued her a verbal warning in July 2017.  *Id.*  at ¶ 25.  Director Blanck also transferred some of Plaintiff's duties to a new hire.  *Id.* at ¶ 26.

Plaintiff responds that she never received a verbal warning; she describes the July 2017 meeting where that warning allegedly issued as a simple discussion about the state of the programs.  ECF No. 65 at p. 10, response to ¶ 25.  And while Plaintiff concedes that Defendant did hire someone new to take over some of her responsibilities in July 2017, she asserts that this person did not start until September and was not able to operate independently for several months.  *Id.* at p. 10, response to ¶ 26.

### c.  September 2017

Defendant asserts that in September 2017, RN Dugan complained about Plaintiff again, and other employees also disclosed ongoing issues with Plaintiff, including that Plaintiff frequently was unable to answer questions, particularly about the electronic medical records program, and appeared disorganized and unreliable.  ECF No. 65 at ¶¶ 27–28, 30–31.  Plaintiff responds that RN Dugan was being insubordinate and attempting to sabotage her, but that Directors Blanck and O'Loughlin conspired with RN Dugan to build a case against Plaintiff.[6]  ECF No. 69 at p. 11, response to ¶ 27.  She further asserts that she was never given enough time to learn the medical records software in order to answer questions about it.  *Id.* at p. 13, response to ¶ 31.

In that same month, Plaintiff performed a site visit to a daycare center, after which the director of the daycare center stated to Director Blanck that Plaintiff did not appear to know what she was doing at the visit and that she improperly completed forms and did not provide an exit summary indicating what the center needed to do going forward.  ECF No. 65 at ¶ 29.  Plaintiff contends that her visit to the daycare center was thorough and complete and that the complaint was a part of RN Dugan's sabotage of her.  ECF No. 69 at p. 12, response to ¶ 29.

Also in September 2017, Defendant alleges that Plaintiff failed to assign staff to two children whom Director Blanck believed ought to have been seen over a weekend.  ECF No. 65 at ¶ 34.  Plaintiff responds that she had delegated one of the nurses to tend to one of these patients.  ECF No. 69 at p. 15, response to ¶ 34.[7]

---

[6] Plaintiff also asserts that Directors O'Loughlin and Blanck were encouraging her to fire RN Dugan, which she would not do.  ECF No. 69 at p. 11, response to ¶ 27.

[7] It is not clear, based on Plaintiff's SOF, which patient Plaintiff is referring to, or whether that patient is either of the two whom Defendant alleges were not given weekend visits.  The visits to which Defendant

Around this time, referrals to the program had significantly declined from the previous year.  ECF No. 65 at ¶ 32.  Directors O'Loughlin and Blanck met with Plaintiff several times in September, and at one of these meetings they issued her a written warning.  *Id.* at ¶ 32–33.  Some of Plaintiff's responsibilities were reassigned so she could focus on improvement.  *Id.* at ¶ 33.  Plaintiff responds that her responsibilities were not reassigned and that she was overwhelmed by all she was being required to do, but despite asking for help, she received none.  ECF No. 69 at p. 14, response to ¶ 33.[8]

It is undisputed that the day before Plaintiff was issued the written warning,[9] Plaintiff emailed human resources to report that she was being harassed, at least in part on the basis of her disability.[10]  ECF No. 65 at ¶ 41; ECF No. 69 at p. 19, response to ¶ 41.  She alleged that Director O'Loughlin had learned, through coincidence, that Plaintiff had seen a pain management specialist.  ECF No. 65 at ¶ 42.[11]  She also stated that in July 2017, when she had been issued her verbal warning, Director O'Loughlin referred to reports that she appeared tired in meetings and asked if she was taking medication that made her drowsy, to which she responded in the affirmative, though she disclaimed taking that medication at work.  *Id.*  Finally, she asserted that Director O'Loughlin made

---

refers should have occurred the weekend of September 27, 2017.  ECF No. 65 at ¶ 34.  However, Plaintiff references a meeting on September 13, 2017, when she was informed that she should have seen a patient but did not.  ECF No. 69 at p. 15, response to ¶ 34.  The court assumes, for present purposes, that the patient to whom Plaintiff refers is one of the two patients noted in the corresponding paragraph of Defendant's SOF.

[8] Once again, the parties' dates do not agree.  Defendant asserts that Plaintiff's responsibilities were diminished at a meeting on September 19, 2017, but Plaintiff mentions having had to prepare for a meeting on September 6, 2017, in order to support her contention that her load had not been lightened.

[9] Plaintiff states in her brief that there is a factual dispute as to when Plaintiff contacted human resources, but this assertion is not discussed or supported, so the court finds no genuine dispute as to this date.

[10] Plaintiff was in a car accident in 2009 and since then has experienced periodic pain which she asserts has limited her ability to perform certain life functions.  ECF No. 64 at p. 20 n.4.

[11] The court takes this fact, and the following facts in this paragraph, from Defendant's SOF.  Although Plaintiff purports to deny these facts, she does not cite to any record evidence to refute them, and the court therefore deems these facts admitted.

6

comments about the rolling briefcase she brought to work with her, calling it "luggage." *Id.*[12]  Human resources investigated the allegation, but in October 2017, they informed Plaintiff that they had been unable to substantiate her claim.  ECF No. 65 at ¶ 44.

### d.  October-November 2017

Defendant alleges that although Plaintiff was given additional training in using the medical records software in October 2017, she did not display any improvement in proficiency.  ECF No. 65 at ¶ 35.  Plaintiff responds that the additional training Director O'Loughlin gave her was "hardly training," as he did not seem to know how to operate the software.  ECF No. 69 at p. 15, response to ¶ 35.  Defendant alleges that in that same month, Plaintiff failed to recognize that a patient had been discharged from the hospital and required some form of follow-up, resulting in the patient experiencing a health emergency.  ECF No. 65 at ¶ 36.  Plaintiff responds that she did not know that the patient had been discharged from the hospital because she "did not scroll down far enough" in an email, and the nurse on duty typically would be in contact with the relevant parties to monitor a hospitalization, but in this instance, when RN Dugan contacted Plaintiff for additional information, Plaintiff's attempts to get that information from the hospital were fruitless.  ECF No. 69 at p. 16-17, response to ¶ 36.

Plaintiff's performance evaluation in October 2017 stated that she was performing below expectations.  ECF No. 65 at ¶ 37.  Three days after her evaluation, she sent a mass email soliciting referrals to Defendant's programs in which she included incorrect

---

[12] Plaintiff contends that Director O'Loughlin also once asked what she had in her water bottle, though it does not appear that Plaintiff included this incident in her complaint to human resources.  ECF No. 69 at p. 22 ¶ 9.  She also asserts that he was condescending toward her.  ECF No. 69 at p. 21 ¶ 7.  It is not clear how these allegations pertain to any of Plaintiff's claims, though, and as she does not make any argument based upon the incident, the court will disregard it.

contact information.  ECF No. 65 at ¶ 38.  Then in November 2017, Plaintiff failed to ensure that a new nurse had access to necessary resources for a weekend shift and exhibited a lack of understanding regarding treatment for a certain health condition.  ECF No. 65 at ¶ 39.[13]

After consultation with human resources, Directors Blanck and O'Loughlin terminated Plaintiff on November 10, 2017.  ECF No. 65 at ¶ 40.

Plaintiff initiated this action on November 15, 2019.  ECF No. 1.  She filed an amended complaint, which is the operative pleading, on October 12, 2021.  *See* ECF No. 56.  In the amended complaint, Plaintiff asserts five claims: Count One alleges discrimination on the basis of disability in violation of the Americans With Disabilities Act ("ADA"); Count Two alleges discrimination on the basis of age in violation of the Age Discrimination in Employment Act ("ADEA"); Count Three alleges retaliation in violation of the ADA;[14] Count Four alleges discrimination on the basis of age and disability in violation of the Connecticut Fair Employment Practices Act ("CFEPA"); and Count Five alleges retaliation in violation of the CFEPA.  ECF No. 56.

## II.   LEGAL STANDARD

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c).  The

---

[13] Plaintiff does not respond to any of the assertions in this paragraph, and the court therefore deems them admitted.
[14] The amended complaint entitled Count One and Count Three as claims proceeding under Title VII of the Civil Rights Act, but otherwise Plaintiff appears to bring the claim pursuant to the ADA.  Defendant points out the apparent inconsistency, and its arguments assume Plaintiff is proceeding under the ADA. Plaintiff does not correct Defendant on this point, and therefore the court construes Count One and Count Three as ADA claims, not Title VII claims.

movant bears the burden of demonstrating that there is no genuine issue of material fact. *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017).   A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *McCarthy v. Am. Int'l Grp., Inc.*, 283 F.3d 121, 124 (2d Cir. 2002) (quoting *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1535 (2d Cir.1997)).   If "there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Id.*

To defeat a summary judgment motion, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998).   Rather, the nonmoving party must point to "specific facts in dispute to show that there is a *genuine issue for trial.*" *Matsushita,* 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)) (emphasis in original).   If the nonmoving party submits evidence that is "merely colorable," or that is not "significantly probative," then summary judgment still may be granted.  *Horror Inc. v. Miller*, 15 F.4th 232, 240–41 (2d Cir. 2021).

When reviewing a summary judgment motion, the court construes the cited evidence in the light most favorable to the nonmoving party and "resolves all ambiguities and draws all reasonable inferences against the moving party."  *Horror*, 15 F.4th at 240.

## III.    DISCUSSION

The CFEPA, the ADA, and the ADEA all operate under a burden-shifting framework. First, a plaintiff faces the initial low threshold of stating a prima facie case under the relevant statute. Once a plaintiff has made their prima facie case, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions. If the defendant is able to do so, the burden shifts back to the plaintiff to show that the proffered reason is pretextual and that the defendant's actions were based upon discriminatory animus. *See McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009) (discussing the burden-shifting framework under the ADA); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (discussing the burden-shifting framework under the ADEA); *Mendillo v. Prudential Ins. Co. of Am.*, 156 F. Supp. 3d 317, 344–45 (D. Conn. 2016) (discussing the burden-shifting framework under the CFEPA).[15] Retaliation claims also use this burden-shifting framework. *See Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

### a.    Age Discrimination Claims

"To establish a prima facie case of age discrimination under the ADEA, a claimant must demonstrate that: 1) he was within the protected age group; 2) he was qualified for the position; 3) he was subject to an adverse employment action; and 4) the adverse action occurred under 'circumstances giving rise to an inference of discrimination.'" *Terry v. Ashcroft*, 336 F.3d 128, 137–38 (2d Cir. 2003) (quoting *Roge v. NYP Holdings, Inc.*,

---

[15] Under the ADA, a plaintiff need only show that discrimination was a "motivating factor," *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 337 (2d Cir. 2000), but under the ADEA, a plaintiff must show discrimination was a "but-for cause" of an adverse employment action, *Gorzynski*, 596 F.3d at 106.  There is some question as to which standard is employed under the CFEPA.  *Hopkins v. New England Health Care Emps. Welfare Fund*, 985 F. Supp. 2d 240, 260 (D. Conn. 2013).   The appropriate standard to be applied is irrelevant to the court's analysis, though, and therefore the question will not be addressed here.

257 F.3d 164, 168 (2d Cir.2001)).  CFEPA age discrimination claims are analyzed under the same framework as ADEA claims.  *Hopkins v. New England Health Care Emps. Welfare Fund,* 985 F. Supp. 2d 240, 260 (D. Conn. 2013).

With respect to her age discrimination claims, Defendant argues that Plaintiff has failed to show the fourth element of her prima facie case, that her termination reasonably could give rise to an inference of discrimination, and therefore that her age discrimination claims must fail.  Furthermore, Defendant argues that Plaintiff wholly has failed to respond to Defendant's arguments for summary judgment on Counts Two and Four, and therefore seems to have abandoned those claims.  The court agrees with Defendant.

Not only has Plaintiff failed to put forth any response to Defendant's arguments regarding her age discrimination claims, which is grounds enough to grant summary judgment, *see Townsend v. First Student*, No. 3:18-CV-1684(VLB), 2021 WL 4798825, at *8 (D. Conn. Oct. 14, 2021) (finding a claim abandoned where the plaintiff had failed to respond to the defendant's argument), but the court finds that there are no allegations in the amended complaint or Plaintiff's SOF from which the court could reasonably infer that Plaintiff's termination was in any part a result of age discrimination.  Plaintiff has alleged no facts indicating that her supervisors harbored discriminatory animus on the basis of her age.  Aside from Plaintiff's bald, unsupported accusation in the amended complaint that she was terminated due to her age, there is no other reference to those claims in the record, much less evidence or argument.

Furthermore, as Defendant points out, Director O'Loughlin is older than Plaintiff, and Director Blanck is only a year younger than Plaintiff.  ECF No. 64 at 30.  They both were members of the same protected class as Plaintiff when they hired her to the position

two years before they terminated her, and "if a decision maker is in [the] same protected class as plaintiff, claims of discrimination become less plausible." *Hasemann v. United Parcel Serv. of Am., Inc.*, No. 3:11-CV-554 VLB, 2013 WL 696424, at *8 (D. Conn. Feb. 26, 2013) (quoting *Drummond v. IPC Intern., Inc.*, 400 F.Supp.2d 521, 532 (E.D.N.Y.2005)).   There is also a "same-actor inference" that weighs against inferring discrimination here: where the same decision-maker hired and fired an individual, particularly within a relatively short period of time, "one cannot logically impute to [those] person[s] an invidious intent to discriminate against that employee." *Choate v. Transp. Logistics Corp.*, 234 F. Supp. 2d 125, 130 (D. Conn. 2002).

Defendant therefore is entitled to summary judgment on Count Two and Count Four, to the extent Count Four alleges age discrimination.

### b. Disability Discrimination Claims

To establish a prima facie case under the ADA, a plaintiff must show: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) (quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir.2006)).   "Discriminatory claims brought under CFEPA, Conn. Gen.Stat. § 46a–60 et seq.[,] are construed similarly to ADA claims." *Hopkins*, 985 F. Supp. 2d at 255.   The only difference in analysis is that the "CFEPA's definition of physical disability is broader than the ADA's." *Id.* (quoting *Beason v. United Technologies*, 337 F.3d 271, 277–278 (2d Cir.2003)).

12

Defendant argues that Plaintiff also has failed to make a prima facie case on her claims of disability discrimination because Plaintiff's disability was not known to her supervisors at the time of her termination, so they could not possibly have discriminated against her on that basis.   Moreover, Defendant argues that it had a legitimate, nondiscriminatory reason for Plaintiff's termination: her continued poor performance over the course of several months.   Defendant argues that Plaintiff cannot show that this proffered reason is pretextual.   Plaintiff responds that her supervisors did have actual knowledge of her disability, and she further argues that the alleged deficiencies in her performance are wholly pretextual and the reports of the same were fabricated for the purpose of terminating her.[16]

There is no dispute that Defendant is subject to the ADA, and Defendant assumes, for purposes of the Motion, that Plaintiff is disabled within the meaning of the ADA and the CFEPA, so the court will do the same.   Also, there is no dispute that Plaintiff otherwise was qualified for the position.   Therefore, she has satisfied the first three elements of a prima facie case under the ADA.

However, in order to satisfy the fourth element of her prima facie case, Plaintiff must show that Defendant knew of her disability, *see Bedor v. Friendly's Ice Cream Corp.*, 392 F. Supp. 2d 367, 381 (D. Conn. 2005), and the court is not convinced that Plaintiff's supervisors did have such knowledge given the weakness of the evidence upon which Plaintiff relies.   Plaintiff asserts in her opposition that her supervisors knew of her disability because (1) she had discussed with Director Blanck an upcoming surgery for bilateral

---

[16] There are a few paragraphs in which Plaintiff (1) states, without any supporting argument, that she suffered from a hostile work environment, and (2) delineates the legal standard for vicarious employer liability.  *See* ECF No. 68-1 at 10-11.  As these statements do not amount to an argument, and do not seem to bear any relation to any of Plaintiff's other arguments, the court will disregard them.

knee replacements, (2) she had made a request for a reasonable accommodation, (3) Director O'Loughlin learned she either was or had been a patient of a pain management specialist, and (4) she had informed the Directors at her interview that she could not lift more than 20 pounds.[17]   The record evidence she relies upon for these assertions are her own affidavit, dated March 14, 2021, and her own deposition testimony, given in January 2021.

Review of the cited evidence, though, reveals only tenuous and speculative support for her arguments.  All she says in the affidavit is that (1) she informed both Directors at her interview that she could not lift more than 20 pounds, and (2) she had conversations with both Directors during the summer of 2017 "regarding [her] disabilities and the possibility of additional surgeries."  ECF No. 68-4 at ¶ 35.  She gives no other details about these conversations, and she does not mention her pain management specialist or her request for a reasonable accommodation.  At her deposition, she stated that she informed the Directors at her interview that she could not lift more than 25 pounds,[18] and she also stated that she informed Director Blanck that she needed to have bilateral knee replacements, but she could recall no specifics about the meeting when she disclosed this information, such as when it occurred or what exactly was said, and she could not recall whether she also told Director O'Loughlin the same thing.  ECF No. 64-1 at 102-03.  She also stated that she "believe[d]" she requested a reasonable accommodation (an ergonomic chair), but here again, she was unable to provide any

---

[17] Defendant's brief refers to some deposition testimony Plaintiff gave which asserted that Defendant knew of previous surgeries she had in 2012 and 2013 because she was employed on a per diem basis with Defendant at that time and someone from Defendant's organization sent her flowers.  Plaintiff makes no argument on this basis, though, and the court finds these asserted facts to be too attenuated from the events at issue to make them relevant.

[18] Elsewhere, she states that she told them she could not lift more than 20 pounds, but this discrepancy is immaterial.

details about the request.  *Id.* at 103-04.  And finally, she testified that at some point, Director O'Loughlin commented about her being a patient of a pain management specialist, but she could recall no details about the conversation in which he made this comment.  *Id.* at 93.  She further testified that Director O'Loughlin knew that she saw the specialist because the specialist's receptionist came to work for Defendant and, in front of Director O'Loughlin, mentioned knowing Plaintiff from the specialist's office.  But she could recall no details about that conversation, either.  *Id.* at 94.

There is no other evidence in the record that supports any of Plaintiff's assertions. Of course, a plaintiff's own testimony is sufficient to create an issue of fact for the purposes of summary judgment.  *Grabin v. Marymount Manhattan Coll.*, No. 12 CIV. 3591 KPF, 2014 WL 3639136, at *4 (S.D.N.Y. July 22, 2014) (finding that the "[p]laintiff's testimony sufficiently raised material issues of fact to foreclose summary judgment.")  But Plaintiff's affidavit and deposition testimony, as vague and speculative as it is, states conclusions more than facts.  With respect to the reasonable accommodation, even if the court were to conclude that an ergonomic chair is sufficient indication of a disability, without any evidence that the request was made to the Directors or that they knew about the accommodation, the court cannot conclude that the relevant decision-makers were aware of Plaintiff's disability based on the request.  And with respect to Plaintiff's disclosure at her interview, even assuming that not being able to lift more than 20 pounds is sufficient to indicate a disability, the same-actor inference would support Defendant's position, since the Directors decided to hire Plaintiff despite the knowledge.

This leaves Plaintiff's conversation with Director Blanck about her upcoming surgery, and the disclosure to Director O'Loughlin about Plaintiff's pain management

specialist.  The court notes that the latter incident only is discussed in Plaintiff's deposition testimony, and, even then, without much specificity.  It is difficult to conclude that the Directors knew about Plaintiff's disability without any information about what was said, and it is difficult to conclude that knowledge of Plaintiff's disability led to her termination without more information about when these disclosures occurred.  Plaintiff asserts in her affidavit that both conversations occurred during the summer of 2017,[19] but this hardly is specific; moreover, Defendant began to document concerns with Plaintiff's performance before that summer.  Furthermore, it is not clear that either disclosure (alone), or even that the two of them together, adequately indicates that Plaintiff has a disability.

However, even if the court were to find that Defendant knew, based on any or all of Plaintiff's alleged disclosures, that Plaintiff had a disability, the court cannot find that Plaintiff was terminated because of her disability.  There is nothing in the record which indicates discriminatory animus.  Although Plaintiff asserts that Director O'Loughlin joked about her rolling briefcase on, at most, half a dozen occasions, the only specific comment she can recall him making is something about her having her carry-on luggage with her. The court is not convinced that this comment is discriminatory in the first instance, but even if it did betray some insensitivity, it certainly was not made with such frequency that

---

[19] Defendant asserts that this affiance regarding timing is a change from Plaintiff's deposition testimony, in which she could not remember when the conversations happened at all, and argues the well-settled maxim that "a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony." *Hinchliffe v. Costco Wholesale Corp.*, 667 F. Supp. 2d 418, 425 (D. Vt. 2009) (quoting *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir.1991)).  The court also notes that Plaintiff's affidavit is dated the day before she filed her objection to Defendant's first motion for summary judgment, to which her affidavit was attached as an exhibit.  *See* ECF Nos. 36, 36-3.  However, while Plaintiff's affidavit is not completely consistent with her prior testimony, it does not completely contradict her prior testimony, either, and it would be inappropriate for the court to make credibility determinations at this stage.  The court therefore accepts the assertions in Plaintiff's affidavit.

it could indicate bias.  *See Hasemann*, 2013 WL 696424, at *6 (finding that "the stray remarks [even] of a decision-maker, without more, cannot prove a claim of employment discrimination.") (quoting *Abdu–Brisson v. Delta Airlines, Inc.*, 239 F.3d 456, 468 (2d Cir.2001)) (alteration in original).  Similarly, the inquiry into Plaintiff's tired demeanor does not clearly indicate discrimination, either; rather, Director O'Loughlin's questions tend to indicate a reasonable concern about an employee predicated upon third-party reports of unexpected behavior.  Even combined, these actions do not give rise to an inference that Plaintiff's termination had anything to do with her disability.  Moreover, it is not clear when Director O'Loughlin made his comments about Plaintiff's briefcase, and the inquiry into her apparent fatigue occurred in July 2017, several months before Plaintiff was terminated.  Not only is the proffered evidence of discrimination unconvincing, but its connection to Plaintiff's termination is tenuous at best.

Furthermore, even if Plaintiff had carried her initial burden and had made her prima facie showing, Defendant has proffered a legitimate, nondiscriminatory reason for terminating her, and Plaintiff has not shown that this reason is pretextual.  Defendant has provided records that document deficient performance beginning in March 2017 and continuing through Plaintiff's termination.  Plaintiff asserts that these records were fabricated, but the only evidence she cites in support of that accusation is that it took Defendant three months to produce them to Plaintiff's attorney.  The court cannot find, based on such scant proof, that internally-consistent business records, that are supported by extrinsic evidence, and that otherwise bear no indicia of deception, are fraudulent.

Plaintiff also objects to her supervisees' reports of her because they were apparently the result of Director O'Loughlin's specific inquiry into her performance.

Plaintiff does not allege, however, that these responses were not genuine, nor is there any evidence that her staff was pressured to provide unflattering commentary.  Therefore, it is irrelevant that Director O'Loughlin sought out feedback from Plaintiff's direct reports. Defendant's reliance upon that feedback as support for its actions does not show pretext.

Next, Plaintiff argues that Defendant's characterization of her performance is ill-founded, since Director O'Loughlin gave her a satisfactory performance review in April 2017 and Director Blanck recognized in an email that Plaintiff was a hard worker.  But the record appears to show that Director O'Loughlin found Plaintiff's performance below expectations in April 2017, *see* ECF No. 68-3 at 2, and even if he had given her a stellar review, these events do not render Defendant's proffered reason pretextual.  The fact that an employee has good qualities and bright spots in their work history does not mean that their overall performance is satisfactory, and an employer's attempt to highlight and to accentuate an employee's upside might well evidence a bona fide attempt to motivate and to work with that struggling worker.

Finally, Plaintiff also contends that the verbal warning that allegedly was delivered in July 2017 never happened, and the court grants that the record is not entirely clear that such warning actually was given.   Granted, Director O'Loughlin's notes of the meeting appear on a form entitled, "Disciplinary Incident Report", and a box is checked off indicating that a formal, verbal warning issued.  *See* ECF No. 64-1 at 185–86.  However, a verbal warning is the only kind of warning for which the recipient is not required to sign the form, and they do not necessarily result in the recipient receiving a copy of the report. *Id.* at 185.  Without the form being signed by (or necessarily delivered to) Plaintiff, it remains possible that matters intended to be discussed were not covered during the talk.

Further, the form's "Nature of Offense" section states that the purpose of the meeting was "just to have a formal conversation" but it makes clear that the talk was not in response to any specific incident.  *Id.*  Nevertheless, at the conclusion of the notes, it documents certain criticism (such as "relying on Sara too much for oversight" and an expectation that Plaintiff would "be able to do admissions and visits") without mentioning the word "warning" or hinting at any potential discipline, as warnings often do.  *Id.* at 186.  Then again, the section on expected corrective action simply indicates that "Jean and Brian will continue to meet weekly, for structure."  *Id.*

The court need not make any findings with respect to this meeting, though, because whether or not Plaintiff was given a verbal warning does not alter the court's overall conclusion.  Even disregarding the verbal warning, Defendant's SOF remains rife with concrete examples of performance issues, many of which were reported by individuals other than the Directors, and many of which are left undisputed by Plaintiff.  Also, it remains undisputed that Plaintiff's performance issues resulted in her receiving additional counseling and training in the months leading up to her termination, and that Defendant issued a written warning in September 2017.  Here, too, Plaintiff's claims of disability discrimination are rendered less plausible by the fact that Director Blanck suffers similar afflictions as Plaintiff due to accidents in which she was involved.  Therefore, Plaintiff has not rebutted Defendant's proffer of a legitimate, nondiscriminatory reason for her termination.

Because Plaintiff has not made her prima facie case, and because she has not rebutted Defendant's proffered reason for her termination, the court finds that Defendant

is entitled to summary judgment on Counts One and Four, to the extent Count Four is predicated upon disability discrimination.

### c. Retaliation Claims

Finally, Defendant argues that Plaintiff's retaliation claims also must fail, since she has not made a prima facie case for discrimination on the basis of either age or disability, and because she has failed to rebut Defendant's argument that her termination was based upon her poor performance.  Plaintiff responds that there is sufficient temporal proximity between Plaintiff's protected activity (her complaint to human resources), and her termination.

In order to state a claim for retaliation under the ADA, Plaintiff must show that (i) she was engaged in protected activity; (ii) Defendant knew that Plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against Plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action. *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 148 (2d Cir. 2002).  CFEPA retaliation claims are analyzed in the same way as ADA retaliation claims.  *See Mendillo*, 156 F. Supp. 3d at 345.   "The Second Circuit has indicated that "[p]rotected activities include both formal and informal complaints to management, where the plaintiff has a good faith, reasonable belief that the underlying challenged actions of the employer violated [the ADA]." *Hopkins v. New England Health Care Emps. Welfare Fund*, 985 F. Supp. 2d 240, 254 (D. Conn. 2013) (quoting *Stephan v. W. Irondequoit Cent. Sch. Dist.*, 769 F.Supp.2d 104, 109 (W.D.N.Y.2011), aff'd, 450 Fed.Appx. 77 (2d Cir.2011)) (alterations in original).

Because Plaintiff need only show that she had a good-faith belief that discrimination was occurring, she need not have carried her underlying claims in order to satisfy the elements of a retaliation claim.  Defendant's first argument therefore fails.  The court accepts for present purposes that Plaintiff's complaint to human resources was not frivolous, and so she has satisfied the first element of her retaliation claim.  Also, it is clear that Plaintiff experienced an adverse employment action in her termination, so she has satisfied the third element.  And finally, the court accepts, for purposes of this analysis, that the temporal proximity between Plaintiff's complaint to human resources and her termination is sufficient to show a causal relationship for purposes of the fourth element. *See Hopkins v. New England Health Care Emps. Welfare Fund*, 985 F. Supp. 2d 240, 254 (D. Conn. 2013) (finding three months between protected activity and an adverse action a short enough period to use temporal proximity to show causation).

However, the court cannot find that Plaintiff has adduced sufficient evidence to rebut Defendant's proffered nondiscriminatory reason for the action taken against her. The record evidence, which Plaintiff has not adequately refuted, is that there were concerns with Plaintiff's performance beginning in March 2017, well before Plaintiff lodged her complaint with human resources, and that several corrective plans were enacted over the next seven months to help Plaintiff improve.  Although the court grants that Plaintiff's written warning came the day after she filed her complaint, the court also must note that Plaintiff was not terminated for almost two months after that warning issued, during which time her supervisors continued to document additional concerns with Plaintiff's performance and to provide additional counseling and training.

Therefore, Plaintiff also has failed to carry her burden on her claims for retaliation, and Defendant is entitled to summary judgment on Counts Three and Five.

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion for Summary Judgment is **GRANTED**.

2. The Clerk of court is instructed to enter judgment in Defendant's favor and to **CLOSE** this case.

   **SO ORDERED** at Hartford, Connecticut, this 21st day of September, 2022.

_____/s/_____
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE
